**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | |
|---|---|
| DATISHA HUNTER, *ET AL*<br>Plaintiffs,<br>vs.<br>WIRELESSPCS CHICAGO, *ET AL,*<br>Defendants. | Case No.: 18-cv-980<br><br>Magistrate Judge Jantz<br><br>**ON CONSENT** |

**DEFENDANTS MOEEN KHALIL AND SAED KHALIL'S RENEWED COMBINED MOTION FOR PROTECTIVE ORDER AS TO THEIR DEPOSITIONS**

Defendants, MOEEN HASAN KHALIL, individually, and SAED HASAN KHALIL, individually, by their attorneys, Aaron B. Maduff and Daniel S. Gajda of Maduff & Maduff LLC, pursuant to Fed. R. Civ. P. 26(c) move this Court for an Order limiting the scope of their depositions to exclude testimony about their personal residences, assets and family, and in support thereof, state as follows:

## RELIEF REQUESTED

Defendants Moeen and Saed Khalil request that this Court enter a protective order striking certain deposition questions and ordering that their depositions be closed.

## INTRODUCTION

Plaintiffs took the Zoom depositions of Defendants Moeen Khalil and Saed Khalil on May 25, 2021, and May 27, 2021, respectively. During both of these depositions, Counsel repeatedly asked the deponents questions relating to their personal addresses, their spouses, and their personal finances and assets (including putting their personal mortgages on the screen.) Both Khalils were visibly upset. Messrs. Khalil's spouses, personal finances and assets, homes, and personal

mortgages are not only irrelevant, but Plaintiffs clearly had the information anyway and there was no need to put Messrs. Khalil through the invasive and oppressive questioning.

In response to these particular questions, pursuant to Fed. R. Civ. P. 30(d)(3)(A), the undersigned "suspended" the respective deposition for purposes of seeking this protective order on the particular question at issue, but specifically asked that the deposition proceed on other topics and questions. This motion follows.

## THE QUESTIONS FOR WHICH DEPOSITIONS WERE SUSPENDED AND A PROTECTIVE ORDER IS SOUGHT

Defendants incorporate the Meet and Confer letter of June 29, 2021, Ex. A, by reference which includes the context, and the areas where the undersigned sought clarification or limitation to avoid suspending the deposition for the question. Attached hereto as Group Ex. B, are the pages of transcript from Moeen Khalil's deposition containing the questions, and as Group Ex. C, transcript from Saed Khalil's deposition containing the questions. The list of specific questions are as follows:

With respect to Moeen Khalil:

1. "Where do you live?" and "I would like your home address please." (Ex. B., 11-23 – 12:9)

2. "What is your spouse's name?" (Ex. B., 18:25-19:21)

3. "Moeen is your wife – and I apologize if I misstate her – how to say her name – Wejdan, W-E-J-D-A-N? And if I mispronounce it, please, I would like to know the correct pronunciation of her name." (Ex. B., 20:12-15)

4. "Have you ever owned 10916 El Caballo Court, Delray Beach, Florida?" (Ex. B., 22:21-22)

5. Do you live at 12889 Pennell, P-E-N-N-E-L-L, Pines Road, Boyton Beach, Florida? (Ex. B., 23:7-9)

6. "Moeen, do you recognize Exhibit 1?" (Ex. B., 25:7)[1]
    a. Exhibit 1 was the mortgage to the witness' personal residence which Plaintiffs had not produced to Defendants and thereby took the witness by considerable surprise, particularly as it started again with reference to his wife. (Ex. B., 24:7-11)

7. "What are you currently invested in as part of you being an investor?" (Ex. B., 39:4-5)

8. "Sir, do you receive any W-2 wages currently?" (Ex. B., 44:6) and "Okay, so again, I repeat. My question is you have – if you're receiving any W-2 wages currently?" (Ex. B., 46:23)

9. "What money were you paid for being an investor in Skynet Wireless in Florida?" (Ex. B., 51:20-21)

10. "Are you currently an employee of any of the companies listed in Exhibit 4?" (Ex. B., 56:15-16) and "Sir, any of the companies on Exhibit 4, are you currently invested in them?" (Ex. B., 57:9-10)
    a. Exhibit 4 was a list pulled from the Florida Secretary of State website—which was not previously produced to Defendants—which listed approximately 60 companies, many of which had been closed and out of business decades earlier and the vast majority of which had nothing to do with the Wireless business at all.

11. "And where do you work presently? What is the address?" (Ex. B., 59:13-14)
    a. This after being informed that the witness was working from home. (Ex. B., 59:6-10)

12. "When did you sell Phillip's Mart?" (Ex. B., 62:20)
    a. A grocery store owned by the witness in the 1990s. "A: First job out of college… I had my own business… It was grocery store… Q: What was the name of the grocery store? A: No, it's Phillip's Mart." (Ex. B., 62:2-15)

13. "What stores do you have in South Florida?" (Ex. B., 69:17)

14. "Are all the banking relationships for your investments through the same bank or do you use multiple different banks?" (Ex. B., 124:5-7)
    a. This refers to current relationships – three years after the stores had closed.

[1] Plaintiffs still have not provided Defendants with a copy of the exhibits in these depositions though they had agreed to do so. As a result, Defendants do not have a copy of the Exhibit to provide the Court.

<u>With respect to Saed Khalil:</u>

15. "What are your current sources of income for work?" (Ex. C., 14:23-24)

16. "Why do you believe that your personal information is not appropriate for impeachment reasons?" (Ex. C., 28:19-21)

17. "Why—and could you please tell me why you don't believe that's an appropriate question?" (Ex. C., 25:17-18) and "Sir, can you tell me why you don't think it's an appropriate question to ask who shares your business?" (Ex. C., 26:2-4)

18. "Sir, is that your signature on Exhibit 1?" (Ex. C., 26:22-24) [Exhibit 1 was the mortgage to Mr. Khalil's personal residence.]

19. "And why do you believe it has nothing to do with this case? There's not a proper question related to impeachment or for other reasons?" (Ex. C., 28:19-21)

20. "Have you ever written an ACO Wireless check for personal expenses such as your groceries or to pay your mortgage?" (Ex. C., 81:14-17)

21. "For the record, I'm going to ask. What is your home address?" (Ex. C., 109:11-12)

The parties were required to engage in a meet and confer on these issues among others and to file a joint status report on July 9, 2021. With the draft status report, Plaintiffs withdrew questions 1-6 (with respect to Moeen Khalil) and 16, 18, and 21 (with respect to Saed Khalil). With respect to question 20, the witness answered the question "No." (See Ex. C., 81:17) As such, although Defendants maintain that the question (which refers to a company which is not a defendant in this case) was inappropriate, Defendants withdraw their suspension of the question and offer the witness's answer as the answer thereto.

## <u>A NOTE ON TIMING AND MEET AND CONFER EFFORTS</u>

.Plaintiffs took Messrs. Khalil's depositions on May 25 and 27. Plaintiff supplied the Court reporter. The undersigned contacted the Court reporter that evening and requested two-day

delivery on transcripts. The transcripts were eventually provided on June 21, 2021. The undersigned reviewed the transcripts as quickly as possible and sent the letter attached hereto as Exhibit A on June 29 seeking an immediate meet and confer.[2] On June 30, Plaintiffs responded by email suggesting a meet and confer for the week of July 19th or 26th.[3] This would result in the instant motion being filed nearly two months after the depositions and potentially after the close of discovery. Defendants therefore filed the motion which the Court denied for failure to engage in meet and confer, ordered the parties to do so, and ordered the parties to provide a status report on those efforts (among other things) on July 9. The Court additionally ordered the parties to provide a schedule for refiling of the motion. (Doc. 225) As noted, although it was not specifically discussed in the meet and confer, the Plaintiffs initial draft of the joint status report (sent prior to the meet and confer as a starting point) withdrew certain questions.

## THE DEPOSITIONS

### A. Moeen Khalil's Deposition

At the start of the deposition, the undersigned informed Counsel that the witness preferred to be called by his given name and not his pet name, "Mike." Counsel proceeded to use the witness' pet name nonetheless, which upset the witness.[4] Shortly thereafter, counsel asked the

---

[2] The parties were in deposition on this case on June 22, 24, and 25 and the undersigned was in mediation with Judge Finnegan on a complicated case until after 10:00 the evening of June 23rd. As a result, it was not possible to review the transcripts and pull the necessary law until the following week.

[3] Defendants again requested a meet and confer on July 1 and provided times. Plaintiffs rejected that request.

[4] MR. MADUFF: … The request from my clients were that you properly refer to him as Moeen. MR. LEVISON: Thank you. Q: Mr. Khalil, again I reviewed my question. I understand that you go by Mike. Do you mind if I call you Mike? MR. MADUFF: Object-- THE WITNESS: No, Call me – call me Moeen. Call me by my real name. (Ex. B., 8:5-14) …BY MR. LEVISON: Q.: Thank you. Mike have you ever given a deposition before." (Ex. B., 9:7-8)

witness for his personal address and the witness objected. (Question 1 above)[5] Pursuant to Fed. R. Civ. P. 30(d)(3)(A), Mr. Khalil's counsel "suspended" the deposition as to this question for purposes of seeking this protective order. Mr. Levison then called the Court and said something to the effect that Mr. Khalil's counsel was suspending the deposition and preventing it from going forward. (Ex. B., 12:17) The undersigned immediately sent an email to the courtroom deputy correcting the statement: "I specifically asked that we continue the deposition on other subjects without interfering with the rest of the deposition." A copy of this email from Aaron Maduff to Rosa Franco, cc all counsel of record is attached hereto as Ex. D. Nevertheless, Mr. Levison continued to insist that the deposition had been suspended and refused to continue.

The parties went off the record for roughly 45 minutes before Plaintiffs' counsel changed his mind and asked everyone to return. Shortly thereafter, the Court contacted the parties by email informing them that the deponent need not provide his home address and that the parties must proceed with the deposition. (Ex. E.) Despite the Court's Order, Mr. Levison went back to the Witness' home address with Question 11 which has ***not*** been withdrawn.

**B. <u>Saed Khalil's Deposition</u>**

Plaintiffs' deposition of Saed Khalil on May 27, 2021, proceeded in similar fashion. Again, the majority of questions were rarely more than tangentially related to claims asserted or issues in dispute, *i.e.*, unpaid wages and overtime. In addition, despite the fact that the Court had advised that Moeen Khalil need not provide his address the prior Tuesday, Plaintiffs' counsel opened the deposition by asking Saed Khalil about his home address[6] and proceeded to insist on asking Mr.

---

[5] Because Plaintiffs have withdrawn this particular question, Defendants do not substantively address it, but it and the other withdrawn questions, along with the conduct of the deposition, are part of the pattern of questioning which taken together was oppressive to the witness.

[6] Again, because the question was withdrawn Defendant does not address it substantively, but it is part of a pattern of questions which were oppressive.

Khalil personal questions related to his home and finances and assets, as well as challenges to the witness' complaints that he did not want to answer questions which were inappropriate, and asking why they were not relevant to impeachment. The undersigned counsel suspended this deposition as to those specific questions and requested the deposition continue with other questions.

## ARGUMENT

In this matter, Plaintiffs have asserted wage claims against the Defendants arising from their employment at several MetroPCS wireless franchises in the Chicagoland area. Moeen Khalil and Saed Khalil have been sued in their individual capacities solely because of their purported ownership interest in WirelessPCS Chicago, LLC and/or Sky Net Wireless IL LLC. Plaintiffs have not pointed to any relevance of these deposition questions at all, and the questions were oppressive warranting suspension of the deposition as to them.

### A. Standard

Courts have discretion in deciding when a protective order is appropriate and what degree of protection is required. *Seattle Times Co. v. Rhinehart,* 467 U.S. 20, 36, 104 S.Ct. 2199, 2209, 81 L.Ed.2d 17 (1984). Rule 26(c) permits courts to issue protective orders "for good cause shown." Fed.R.Civ.P.26(c). While good cause can be difficult to define in absolute terms, it generally signifies a sound basis or legitimate need to take judicial action. *Wiggins v. Burge,* 173 F.R.D. 226, 229 N.D.Ill. 1997) (citing *In re Alexander Grant & Co. Litig.*, 820 F.2d 352, 356 (11th Cir.1987)).

In addition, the determination of good faith also encompasses a balancing of the interests involved. *Doe v. Marsalis,* 202 F.R.D. 233, 237 (N.D.Ill.2001); *Wiggins,* 173 F.R.D. at 229. Courts generally seek to balance the harm to the property and privacy interests of the party seeking

the protective order and the importance of disclosure to the public. *Citizens First Nat'l Bank of Princeton v. Cincinnati Ins. Co.*, 178 F.3d 943, 945 (7th Cir. 1999); *Pansy v. Borough of Stroudsburg*, 23 F.3d 772, 787-89 (3d Cir. 1994); *In re Alexander Grant & Co. Litig.*, 820 F.2d 352, 356 (11th Cir. 1987). Among the factors considered in this balancing are (1) whether parties have an interest in privacy; (2) whether information is being sought for legitimate purpose or for improper purpose; and (3) whether there is a threat of serious embarrassment to a party. *Grove Fresh Distributors, Inc. v. John Labatt Ltd.*, 888 F. Supp. 1427, 1444 n. 25 (N.D. Ill. 1995), *citing Pansy*, 23 F.3d at 787-88

**B. The questions are oppressive**

In *Dent v. U.S. Tennis Ass'n*, 2010 WL 1286391 at *1 (E.D. N.Y. 2010), the plaintiffs moved to compel the reappearance of a defendant for further deposition testimony following defense counsel's instruction not to answer questions concerning the defendant's compensation and net worth. Guided by Fed. R. Civ. P. 30(d)(3), the *Dent* court opined

> [Q]uestions concerning the deponent's compensation and net worth concern private matters that ordinarily enjoy a measure of protection in litigation, including some demonstration of relevance before disclosure is required. Questions about these matters tend to be annoying and embarrassing, and in the absence of relevance, may be unreasonably so….Net worth is only relevant if there is a finding that punitive damages should be awarded. As a result, courts typically do not permit discovery concerning net worth until the jury has made such a finding. Ability to satisfy a judgment only becomes relevant after a judgment is entered, and therefore does not provide any basis for discovery pre-judgment.

*Id.*

Plaintiffs have not obtained a judgment against the Khalil Defendants. In addition, their

conclusory assertion of entitlement to punitive damages[7] does not justify an inquiry into the Khalil Defendants' personal finances at this stage in the proceedings. Courts may, on good cause shown, forbid discovery or stage its production to protect a party from annoyance, embarrassment, or oppression because "[d]iscovery aimed at an opponent's personal finances is a quick route to the underside of the opponent's skin." *Finch v. City of Indianapolis*, 2011 U.S. Dist. LEXIS 67577 (S.D. Ind. 2011) (citing *Estate of Lee ex rel. McGarrah v. Lee & Urbahns Co.*, 876 N.E.2d 361 (Ind. Ct. App. 2007), *City of Newport v. Fact Concerts, Inc*., 453 U.S. 247, 269-70, 101 S. Ct. 2748, 69 L. Ed. 2d 616 (1981) and Fed. R. Civ. P. 26(c)(1)(A)). The *Finch* Court further noted:

> It seems self-evident that a person's personal financial records dating back five years . . . are something almost all persons would prefer to keep private. . . . [A] request for such records would be, for most, annoying and quite likely embarrassing, unduly burdensome, and expensive as well. We think that rare is the person, even one of clear conscience, who would unhesitatingly respond to such a request without being compelled, even with assurances of confidentiality.

*Id*. at *12 (citing *Estate of Lee*, 876 N.E.2d at 369).

While the *Finch* court recognized that the fact that a discovery request is annoying to the recipient is, of course, not a reason in itself to deny the discovery, it ultimately concluded that the question was whether the balancing of the Rule 26 factors militates in favor of requiring individual financial information to be provided *at this stage of the case*. *Id.* In protecting disclosure of this information, the *Finch* court found that it was "inappropriate to subject the individual defendants to this discovery on nothing more than the plaintiffs' bare allegation they are entitled to punitive damages" and "any inefficiencies caused by delaying this discovery are

[7] Damages in wage cases are liquidated in amounts (e.g. double damages under §216(b) of the FLSA, treble damages under the Chicago ordinance, 5% under the Illinois Minimum Wage Law, 2% under the Illinois Wage Payment and Collection Act, etc. There is a split in the courts on punitive damages in retaliation claims which are only two of the numerous counts in this case. Moreover, while it is difficult to parse Ms. Hunter's testimony, her retaliation claim appears to be that when the stores were sold, she was not rehired by the new owner.

outweighed by the interests served in delaying it." *Id.* At *13 - *14. A similar conclusion should be reached here as the punitive damages claimed by Plaintiffs' in their complaint relating to alleged retaliation by the Defendants have certainly not been substantiated by any of the discovery to date and remain no more than "bare allegations" which do not support inquiry into these topics at this stage.

**C. The questions are not relevant.**

At several points during the course of the deposition the undersigned offered to reconsider his position if Mr. Levison could offer some explanation of why the questions were necessary. For example, "If you want to ask about his investments with respect to WirelessPCS and Skynet, I don't want to be objecting to that. But to the extent that you're harassing the witness about his personal investments and financial situation – and I'm not entirely clear if that's where you're going – I respectfully suspend the deposition as to that question … If I am misunderstanding your question, please clarify." (Ex. B., 39:9-19) Mr. Levison provided none. As another example, "I'm going to object to the question as going after his personal assets. If you can give me some other purpose, I am willing to hear it." (Ex. B., 69:18-20) And again, "I'm going to object to the question as going after his personal assets and investments. Once again, I'm open to hearing how it is otherwise relevant to this case. (Ex. B., 124:8-11, "Mr. Martin" is a court reporter error, it should read, Mr. Maduff.) Mr. Levison did not respond during the deposition. The undersigned's pre-meet and confer letter of June 29, made a similar request for reasons that the questions were necessary and got no response.

Finally, at the July 8 meet and confer ordered by the Court, Mr. Levison asserted that the questions were proper for a "piercing the corporate veil theory."[8] Mr. Levison provided a single

[8] In the July 9 Joint Status Report, Plaintiffs raise the possibility of a third amended complaint to add allegations related to piercing the corporate veil among others. As discussed, these questions are improper even under such a

case citation without other discussion, *Fontana v. TLD Builders, Inc.*, 840 N.E.2d 767 (Ill. 2d Dist. 2005). The undersigned specifically asked if there were anything else he should consider and Mr. Levison stated that other than the cases cited therein, there were no other points.

*Fontana* sets forth a two-prong test for piercing the corporate veil. The "Unity of Interest and Ownership" Prong, and the "Fraud, Injustice or Inequitable Consequences" Prong. The party seeking to pierce the corporate veil must meet *both.* The former prong provides 11 different factors (*Id* at 778), and the latter turns on the question of whether assets of the corporation were "transferred or dissipated to avoid paying a judgment." *Id* at 782. None of the questions for which the deposition was suspended could possibly lead to evidence as to any of these items.

As to Moeen, Questions 7, 8, 9, 10, and 13, relate to current income and assets, some three years after the stores at issue here had closed. Questions 9, 12, and 13 address businesses that have absolutely no relation at all to the Defendant stores in this case. In particular, Phillips Mart (Question 12) was a grocery store sold in the 1990s. And Question 11 "And where do you work presently? What is the address" after being informed that the witness was working from home, is an effort to obtain the witness' home address after the Court had already informed the parties that the witness did not have to share that information. The only question that might come close to relevance to a non-pled piercing the corporate veil theory is Question 14 "Are all the banking relationships for your investments through the same bank or do you use multiple different banks" is far broader than necessary to question comingling with the corporate defendants here, WirelessPCS Chicago, LLC and Sky Net Wireless, IL, LLC, particularly when Mr. Levison has

---

theory, but at the time of the deposition (and to this day) the Second Amended Complaint does put Defendants on notice of such a theory in the first place. Not only does such a theory need to be pled, but if inadequately pled, Courts have dismissed it. *See e.g., RehabCare Group East, Inc., v. Certified Health Management*, 2007 WL 3334500, *2 (N.D.Ill. Nov. 8, 2007) (piercing the corporate veil theory dismissed because plaintiff failed to sufficiently plead the theory and noting that "numerous courts have granted motions to dismiss because the party seeking to pierce the corporate veil failed to adequately plead" *citing cases.*) *See also, PNC Bank, NA v. Hall* et al., 2010 WL 3947506, *4 (ND. Ind. Oct. 7, 2010).

put some 60 companies on the screen.[9]

As to Saed Khalil, Question 15 "What are your current sources of income for work?" is again current, some three years after the corporate defendants in this case closed their doors. And Questions 17 and 19 are questions aimed at nettling the witness. The witness had expressed his discomfort and said that he didn't feel his personal information was appropriate. These last two questions asking him why he felt the questions were inappropriate and why he felt that a question was "not a proper question related to impeachment or for other [unstated] reasons" have no relevance at all to corporate formalities – they were simply argumentative challenges to the witness' expression of discomfort. Moreover, with respect to question 17, the undersigned got the witness to answer the question which had bothered him in the first instance. "Q: Does anyone share that office with you…A: I don't feel like this is an appropriate question. Mr. Maduff: Saed[.] The Witness: Yeah[?] Mr. Maduff: If you can answer the question, please do. The Witness: No."[10]

While the Court must balance the relevant interests in determining whether good cause exists for the issuance of a protective order, here the absence of any probative value or legitimate purpose for the information sought, compared to the personal nature and privacy concerns relating to the questions posed weighs in favor of a protective order. Indeed, Plaintiffs' counsel has been provided with more than ample time to question the Khalil Defendants about issues relevant to this case. Additional inquiry into these Defendants' personal matters such as their mortgages, family, and assets should be disallowed, and their depositions deemed concluded. *See e.g, Hanlin v. Mitchelson*, 623 F. Supp. 452 (S.D. N.Y. 1985), judgment aff'd in part on other grounds, rev'd in part, 794 F.2d 834, 5 Fed. R. Serv. 3d 969 (2d Cir. 1986) (court denied the plaintiff's motion to compel

[9] Again, the exhibit has not been provided to Defendants.
[10] The transcript does not reflect the intonation and one might think that witness is saying "No" to the undersigned. But it was an answer to the question.

continuation of the defendant's deposition after the deposition was unilaterally terminated by defense counsel.)

WHEREFORE, Defendants Moeen and Saed Khalil, respectfully request that this Honorable Court enter a protective order shielding them from the questions identified herein and terminating their depositions.

Respectfully submitted,

by: /s Aaron B. Maduff
_ Aaron B. Maduff

Aaron B. Maduff
Atty. No. 6226932
Daniel S. Gajda
Atty. No. 6328491
Maduff & Maduff, LLC
312-276-9000

## CERTIFICATE OF SERVICE

By my signature below, I hereby certify that on July 9, 2021, I electronically filed the attached Defendants' Moeen Khalil and Saed Khalil's Renewed Combined Motion for Protective Order as to their Depositions with the Court's online ECF system that will send a copy to counsel of record.

Respectfully Submitted,

By: /s Aaron B. Maduff

Aaron B. Maduff
Atty. No. 6226932
Daniel S. Gajda
Atty. No. 6328491
Maduff & Maduff, LLC
312-276-9000